Good morning, Your Honors. May it please the Court, Lenore Elbert on behalf of the plaintiff Helen Galope. This is a case where we have a borrower who purchased a LIBOR mortgage from New Century Mortgage in 2006. Ms. Galope maintains that she would have never purchased this loan if she had known that the LIBOR interest rate could have been manipulated or fixed by the person that she was borrowing the loan from. In essence, this is really a case that, except for the redistribution of wealth from the middle class to the top 1% through LIBOR rigging, we wouldn't have had over 90% of the loans that were in this mortgage-backed trust actually foreclosed on. When a financial institution is allowed to bet against the homeowner or the borrower in a mortgage-backed securitized trust, the independent market function is absolutely necessary. When you take away the independent market function here, the independent market rate, all of a sudden you're giving the borrower all of the power and authority to rule in the beginning of the loan to the end of the loan and what happens in the middle. And in this case, what happened in the middle was we had a middle class of borrowers that all their loans were put into a $1 billion mortgage-backed securitized trust that were designed specifically to be foreclosed on if Barclays, who in this case designed the trust, also decided to buy the cap swaps and the interest rate swaps. And that's exactly what happened. The LIBOR rate is actually maintained through 16 different institutions and only the middle institution numbers are actually taken to create the LIBOR rate. However, here we have an anti-competitive effect because we have every single major financial institution that basically participates in creating this rate. When every single financial institution gets to participate in creating a LIBOR rate, which we already have evidence that this was fixed and manipulated in order for them to take advantage of the swap trades that they were doing, then all of a sudden you don't have any entry into the marketplace that are allowed for other financial institutions to grow. Ms. Elbert, your client bought her mortgage and acquired her mortgage in 2006. She acquires it from New Century. Yes. Okay. And was the rate that she secured, that was an interest-only loan? It was called a locked interest rate, interest-only loan. It was locked for the first several years. Okay. And so it was locked until when? I believe it was locked for the first five years, four years or five years. It was several years. Okay. So until either 2010 or 2011, someplace in there. Correct. Okay. And so the rate that she got was fixed. Was that rate tied to the LIBOR? The loan was tied, the debt was tied to the LIBOR. Okay. Was the rate that she got tied to the LIBOR? No, the rate was higher. It was 8.775%. Okay. And so how did the LIBOR affect the rate that she acquired in 2006 from New Century? The LIBOR affects it in two ways. First, we have the consumer expectation test, what a consumer would expect. And under Ms. Galop's situation, she was actually refinancing because her prior LIBOR loan, that it was starting to adjust. These are subprime loans that have a lower initial rate, and then they adjust upward. So she was shopping around in 2006 for a new loan arrangement. She was pushed into a new LIBOR loan that had this fixed rate upon the promise, was like a bait-and-switch upon a promise that it was going to be a lower loan rate when she gets there. It's 8.775%, but the promise is, oh, but we'll be able to flip you. And this is back in 2006 where there was a ---- All right. These were promises made by who? By New Century? They were made by the loan seller, yes, New Century. Okay. So that's New Century that's making this. Okay. Now, I understand from reading, from looking at your complaint, and I think it's a couple of places, but at least one place is paragraph 47, that the LIBOR rate was suppressed by the conspirators. Is that correct? That's what the Federal Government had agreed. Yes, that's what they believed had happened. Okay. So there actually was a lower rate than there might have been if there had been free competition. Is that correct? That isn't the way the loans actually operate. Yes, there is a lower rate. If the loan was based on, your amount of debt was based on literally that LIBOR rate, but the way these mortgage-backed securitized trusts work with the subprime loans, the subprime loan actually, even though you have this locked interest rate, your debt is tied to the LIBOR plus whatever points. So you're not really paying off your debt when you're paying off those first initial years. So what the financial institutions were able to do, they knew exactly how much they were going to be getting on interest rate from the borrower because they fixed it at the 8.775. And then at the same time, under the swaps, they knew exactly how many months they could go out on doing the swap agreements, which coincided with how long they did the fixed rate. And so then they were able to generate money by entering into the swap agreement. All right. That's very technical and swimming just a little bit over my head. But let me go back to things I think that I can grasp here. Okay? So she got an 8.775 rate from New Century. She knew she was getting that rate. And was there anything in the document that indicated that was tied to the LIBOR? Yes. On the very first page, it says in big, bold letters that this is a LIBOR market rate loan. Okay. And that rate was suppressed. That was actually a lower rate than it might otherwise have been. Correct. Okay. So it sounds like she got the benefit of the anti-competitive acts by banks somewhere beyond New Century. This is exactly what the district court argued. But it's in your complaint, right? That's what you said in your complaint, that the rate was suppressed. Yes, the rate is suppressed, but it doesn't mean that she received the benefit of that rate. It isn't that the suppression of the rate doesn't lower the amount that she was indebted to. These are subprime mortgages. They're designed a little bit different. As a consumer, we often believe, oh, this is the interest rate and this is the principal and that's what I owe. So it sounds to the layperson that, oh, if I have a LIBOR rate loan and it's suppressed to 2 percent, then I'm only obligated to repay the 2 percent plus whatever the principal is. And if I'm understanding your question, that's the question you're asking me. But these are subprime loans. And although it sounds that way, that isn't actually the way the actual debt is incurred. The debt actually is a higher rate other than the actual LIBOR loan rate. But what they're able to do, because they put the loan into the mortgage-backed securitized trust while suppressing this rate, is there were two things. The consumer who thought she could flip out of this loan could look in the newspaper and see these are what the market rates are. Because LIBOR and current index, T-bill is another common one. When you look in the real estate section, you see these interest rates. These are the going interest rates. You see that these are the market rates. So there is a reasonable expectation with that lower suppressed rate that she wouldn't be stuck at this high 8.775 percent loan, because we're talking about someone who's fully employed, had good credit. There was no reason for her to have a subprime loan. Second thing, so we have this consumer expectation on one side that you can flip out of this, but you couldn't ever flip out of it because there wasn't any competition there to flip out of. Because all of the ---- And what made her think that she could flip out of it? Because when you look in the newspaper and you see what the market rates are, they were low. They were a lot lower. And LIBOR is one of them. If you open up your newspaper, you'll see LIBOR right there. So when you're looking in the real estate section, you will see your LIBOR rate, your current index rate, and usually your T-bill rate. When people are shopping around for loans, they'll see, okay, these banks are offering these interest rates, and they'll see what the market rates are. That is what consumers do when they're shopping. Okay, so I want to make sure that I understand exactly what her antitrust injury is here. Her antitrust injury is that she accepted a higher rate on an interest-only loan with New Century on the premise that within some amount of time she would be able to acquire a lower interest rate loan from somebody else. Correct. And those rates were misleading because of the conspiracy regarding LIBOR. Well, yes, they were. It was very misleading because any reasonable consumer would believe if you're seeing a 2%, 3%, 4% market rate out there, and you're having it ---- Wouldn't your theory allow somebody who didn't even acquire a mortgage at all to come in and say, I thought that something was going to change in the future, and so I didn't get into the market because there was this LIBOR conspiracy going on? No, it wouldn't because you have the direct purchaser rule. You have to be a direct purchaser. Ms. Gallopi was a direct purchaser of this LIBOR loan. I understand the struggle. It's hard because we're dealing with a sophisticated and complex financial structure to begin with, so it's not like we're talking about Nike tennis shoes or, you know, PlayStation or something that's a little bit simpler to put your mind around. But that's why you have to look at both sides of this transaction. You have to look at what the consumer expected. If you're tying yourself into a 30-year contract, you don't expect, and especially when it's an adjustable rate loan that becomes an adjustable rate loan, you don't expect that the person who's borrowing you the money can actually manipulate what that interest rate is. Was an application made for a mortgage? The application for the mortgage was made originally in 2004, and that's when she received her first LIBOR loan. So this was the first flip from the first LIBOR loan into the second LIBOR loan product. And she was approved? Yes. And all of her asset structure, income, and everything was all part of the application? Yes. And it was she didn't have to pay anything on the principal. Is that right? Well, this was a refinance, so correct. On the 2006, there was nothing to put down because it was a refinance of the 2004 LIBOR loan. The 2004 LIBOR loan, there would be a down payment, but not on the 2006. What happened to the principal then? It just sat there with not being paid down. Right. When you have the initial fixed rate, so she was flipped from one locked fixed rate LIBOR loan to a second refinance of a locked rate fixed LIBOR loan, there is no, the principal will increase on these subprime loan products. They will not decrease. So the debt gets larger. Even though the person sitting there making all their monthly mortgage payments, their debt is getting larger and larger and larger as they go. How could that be? How could that be? If they paid the interest, how could that be? It would get larger. I don't understand this. Because of the way that the loan instruments are structured, and that's why they call them subprime mortgages. They actually capitalize. They capitalize upon each other. So although you're reading something at the top in big, bold letters that sounds like it's pretty straightforward, your interest only of 8.775 percent, it doesn't mean that the 8.775 percent for those first two years covered what the bank said was your monthly mortgage obligation to them. So then every single month a chunk of that money actually gets added on to the outstanding principal. And then that's why ---- Is this a secret or is this contained in part of the documents? No. It's in the documents. It's not a secret. The problem is, is that on the motion for summary judgment, the defendants, even though it was their burden of proof, they didn't bring in any expert declarations with regard to how the mortgages actually worked. So it's our position that they have the burden of proof in motion for summary judgment to bring in the experts to explain and not to allow the court to speculate or make these conclusions out of pure speculation that this is how the loan worked. We did have the proof of the 2004 loan. As soon as it was going to readjust, it was a LIBOR loan getting ready to readjust in 2006. And under the court's theory, if the loan, if that LIBOR rate was lower, it sounds like then her mortgage payment should have went down. But it didn't. It was going up because this is how these actual subprime loans work. That's why she needed to go ahead and grab it. The 8.775% refinance in 2006 under the LIBOR, the new refinance, was a lower monthly payment than what she would have been paying in 2006 on an interest rate adjustable LIBOR loan that she had obtained in 2004 that was running on the actual adjustable interest rate. So maybe that's a better way of back-ending it for the court to understand that although it is a lower rate, it doesn't mean you're getting the benefit of the bargain. And I hope that that kind of helped. But on the back end, we also have... Counsel, the arguments that you're pressing right now all go to your antitrust claim? Right, and we have other standing issues in the case. Yeah, and you have other claims that the district court also dismissed, which you may want to get to. Yes. I would like to get to the 11 U.S.C. 362 violation. We did mention the Ment case, and there is concurrent jurisdiction, and 28 U.S.C. 1334 does give concurrent jurisdiction. I know that there was one case that was fully briefed for this court. It is completely in a posit on the facts because we're talking... That case was a State court malicious prosecution case, and they were asking, you know, whether or not there was jurisdiction or whether or not the bankruptcy court had jurisdiction. And in that case, it did because it was apples and oranges. But this Ninth Circuit had already ruled that under the 11 U.S.C. 362 claim could go forward. So that should have been law of the case. We shouldn't have had to have come back and done a jurisdictional argument on it again. I think it was at least waived. They should have brought it up at the first appeal if they wanted to make that argument then. We also had the issue of the breach of good faith in fair dealing. When you're looking at the breach of good faith in fair dealing, there are two different elements. The defendants tried to narrow it down, saying that 11 U.S.C. 362 piggybacks. And so long as the court has no jurisdiction over that, doesn't have jurisdiction over a breach of good faith in fair dealing. But we're talking about Deutsche Bank National Trust Company being the trustee of the loan. And as the trustee of the loan, they still had... We had a loan there. We had a deed of trust that they actually had to act in good faith. And by selling, using, invoking the power to sell in a nonjudicial foreclosure forum, knowing that they weren't supposed to, then we have a breach of good faith in fair dealing. With regard to the fraud case, the fraud can be considered a misrepresentation or it can be considered an omission. I want to update this court on the LIBOR MDL in New York. When everything was fully briefed, that one mortgage defendant was still up in what the Supreme Court was deciding, whatever it was deciding with regard to jurisdiction. It is back now and it is live in New York. It's only against Bank of America. It's not against our defendants. There they have passed a motion to dismiss on fraud. They didn't revisit the antitrust issues because the court had already kicked it a long time ago, kicked it down the road. But they did revisit the fraud issue and they did find fraud there. So in a comity of interest for the same exact reasons that we have laid out in our briefing, we should also have our fraud claims survive too. I see I only have three minutes. And although I know we have some other causes of action, I want to save a few. Thank you. Thank you. Counsel. Good morning, and may I please the court. Matthew Papora of Sullivan and Cromwell appearing on behalf of the Barclays FLEs. I plan to take 10 minutes and then we'll turn over the remainder of the FLEs' time to counsel for the other remaining FLEs. Your Honors, before I walk through the various grounds on which this court should affirm dismissal of all claims against Barclays, I'd like to emphasize the fundamental deficiency in Ms. Galopi's case, which shows why all of her claims against Barclays ultimately fail. Now, put simply, Ms. Galopi cannot proceed on the sole theory of liability that this court determined at the pleading stage was available to her. As your Honors know, this court previously determined that Ms. Galopi had adequately alleged injury solely on a theory of fraudulent inducement. And I think we heard Ms. Albert just confirm that up here. And that was based on Ms. Galopi's allegation that she would not have purchased her LIBOR-linked mortgage loan had she known that LIBOR was being manipulated. Now, the court recognized at that time that Ms. Galopi had never made a single LIBOR-based payment on her loan. And that, therefore, she had not suffered any injury in connection with payments she made on her loan, but instead had adequately alleged a purchase time injury when she was fraudulently induced into executing her loan with New Century Mortgage Corporation in December of 2006. Now, in determining that Ms. Galopi could proceed with claims against Barclays, this court credited Ms. Galopi's allegation that Barclays was responsible for misrepresentations or potentially omissions that New Century had made to her. And that was based on Ms. Galopi's allegation in the complaint that New Century somehow acted as Barclays' agent when it dealt with Ms. Galopi. But, Your Honors, that allegation has been thoroughly discredited at summary judgment. Ms. Galopi has failed to adduce any evidence whatsoever in support of her allegation that Barclays was involved in New Century's sale of Ms. Galopi's loan, let alone that New Century was acting as Barclays' agent when New Century actually engaged with Ms. Galopi. Moreover, Barclays submitted affirmative evidence proving that New Century was not acting as its agent or that New Century was making any representations on behalf of Barclays. On those facts, Judge Carney correctly determined that any injury suffered by Ms. Galopi at the time of her purchase is not attributable to Barclays. That uncontroverted fact, Your Honors, dooms each of Ms. Galopi's claims against Barclays, and I'll turn to each of them now. This court should affirm dismissal of Ms. Galopi's antitrust claim on two separate grounds. First, Ms. Galopi unquestionably suffered no antitrust injury. Ms. Galopi's fraudulent inducement theory amounts to a claim that she was unfairly duped into executing a loan that she would not have executed had she received adequate disclosures. But that claim, of course, has nothing to do with the harm to competition. Indeed, Ms. Galopi fails to show how her claim flows from any competition reducing aspect of Barclays' alleged conduct. And that, of course, is the essential element that a plaintiff needs to show in order to establish antitrust injury. Ms. Galopi has not shown it because she did not suffer antitrust injury. Now, recognizing that failure, Ms. Galopi summarily argues in her papers that Barclays' LIBOR-related conduct somehow constrained the residential mortgage market in Southern California. And the theory, although vaguely defined, goes something like this. Barclays' LIBOR-related conduct somehow prevented mortgage originators in California from originating non-LIBOR-linked loans. And therefore, that functionally forced her into entering into a LIBOR-linked loan. But as Judge Carney found below, there's not a shred of evidence in the record for this theory. And the actual theory has no sort of factual basis. There's no logical way that one could explain how this conspiracy worked. And, in fact, Ms. Galopi's own arguments on appeal undermine it. Indeed, at page 37 of her opening brief on this appeal, she references a securitized trust into which her loan was placed in 2007. And she notes that that trust consisted of over 5,000 loans and says that almost half of those loans were non-LIBOR-linked loans. Thereby, by her own argument, she makes clear that borrowers to whom she was reportedly similarly situated had no problem obtaining a non-LIBOR-linked loan from New Century Mortgage Corporation. Because there's no evidence that Ms. Galopi suffered any injury linked to reduced competition, Your Honors, her antitrust claim fails. But second, equally determinative of her claim, is that Ms. Galopi would have no standing to bring an antitrust claim because she's not shown that she could be an efficient enforcer of the law, even if she had suffered antitrust injury. Now, the district court correctly held that the relationship between Barclays' conduct and Ms. Galopi's injury is too remote, indirect, and speculative to confer antitrust standing on Ms. Galopi. And that conclusion is relatively obvious, Your Honors, considering two main facts of record. Ms. Galopi did not transact with Barclays when she purchased her loan, and she never made a single LIBOR-based payment. Now, on those facts, it's simply not credible, and certainly there are no facts of record to support an argument that Barclays' LIBOR-related conduct proximately caused her injury. It simply did not. Now, if we can shift gears to talk about Ms. Galopi's fraud-based claims, this court should also affirm dismissal of Ms. Galopi's fraud, UCL, and FAL claims on two independent grounds. First, Ms. Galopi fails to identify any actionable misstatement or omission made by Barclays when she obtained her loan from New Century. And second, Ms. Galopi has failed to show that she actually relied on any misstatement or omission. Now, at the district court, Ms. Galopi expressly abandoned her fraudulent omission theory and decided instead to proceed only on an affirmative misrepresentation theory. I will nonetheless walk briefly through the fundamental flaws with both, but I'll begin with the affirmative misrepresentation theory that she actually pursued in the court below. Now, Ms. Galopi argues that the misrepresentation in this case was made in the note itself. Now, at page 41 of her opening brief, Ms. Galopi claims that the note says that the adjustable rate on her loan would be based on LIBOR. And Ms. Galopi says that the note characterizes LIBOR as, in quotes, an independent market rate. The problem here is that the note makes no such characterization. That language exists nowhere in the note. It simply states that at the end of the two-year fixed rate period, the interest rate on her loan would be based on LIBOR, as published in the Wall Street Journal, plus a margin. The note neither represents how LIBOR would be calculated nor characterizes it as an independent market rate. And simply put, there's no credible way to read this language as a guarantee that LIBOR would be calculated free of manipulation. Judge Buchwald, the judge overseeing the great majority of LIBOR-related litigation in this country, came to the same exact conclusion when analyzing virtually identical contractual language in the multidistrict litigation. Put simply, Judge Buchwald found that this boilerplate language could not be seen as a representation, and the same result should follow here. And I should just remind the panel that even if the note could possibly be read as a guarantee in any way, that would be a guarantee from New Century, not from Barclays, because, again, it was New Century who was contracting with Miscalope. Now, moving to the fraudulent omission theory, Your Honors, it's not surprising that Miscalope stepped away from that theory because that is doomed to failure because under California law, an omission is actionable only when there is some relationship between the plaintiff and defendant in which a duty to disclose can arise. And that can only come into being when the parties are engaged in some sort of transaction. Now, again, Miscalope had no relationship whatsoever with Barclays in December of 2006 when she entered into her loan agreement with New Century, and any omission, therefore, would fail as a matter of law. Finally, with respect to reliance, and this really applies whether we're talking about an affirmative misrepresentation or an omission, Miscalope has failed to Her entire reliance argument hinges on a conclusory, self-serving statement in her declaration that she would not have purchased the loan if she had known that someone could try to manipulate the LIBOR rate. But that assertion, without more, Your Honors, is insufficient to withstand summary judgment. And once again, Miscalope's own representations undermine that argument. Miscalope alleges time and again that when she obtained her loan from New Century in 2006, she intended to refinance her debt within the initial two-year fixed-rate period of the loan before she would be required to make a single payment tied to LIBOR. So the idea that a LIBOR-related disclosure would have been material to her, considering she never intended to make a LIBOR-based payment, is simply not credible. There are certainly no facts of record to support that. And finally, Your Honor, with respect to Miscalope's implied covenant claims or her claim, that claim fails as a matter of law. California law is clear that an implied covenant claim cannot lie based on formation of a contract. There has to be a contract in existence between the parties. Two things here, considering Miscalope's sole theory of injury that she was induced into entering into the loan, that presumes that the conduct occurred prior to the formation of the contract. So an implied covenant claim can't lie there. And secondarily, again, that contract was with New Century, not with Barclays. So for those reasons, Your Honors, and the additional reasons set forth in our papers, we ask the Court to affirm the lower court's dismissal of all claims against Barclays. Thank you. May it please the Court, Your Honors. Andrew Finch for Deutsche Bank AG. Your Honors, I'd like to begin by noting something I think is quite telling,  and I believe there's been a single mention of my client, Deutsche Bank AG. And that's because Deutsche Bank AG was added in the Fourth Amendment complaint after this circuit reversed and sent the case back down. And there are virtually no allegations in the complaint relating to Deutsche Bank AG. It's mentioned ten times in the Fourth Amendment complaint. Not all of those are really even substantive mentions. And what's really important to focus on here is what's alleged in the Fourth Amendment complaint. So as has already been discussed, what is alleged is that Ms. Galope bought a loan, got a loan from New Century. There is no allegation in the complaint that Deutsche Bank AG had anything at all to do with that loan or communicated with Ms. Galope about her loan, made any misrepresentations to Ms. Galope about her loan, nothing. The second point is that there is an allegation in the complaint, there are interest rate loan for a period of time that was then to revert to a floating rate based on LIBOR. But there's no allegation in the complaint that Ms. Galope ever paid a LIBOR rate. And that's very significant, Your Honors. There is an allegation that she paid a fixed rate for a number of years and then refinanced and paid a fixed rate again, but she never paid a floating rate to Deutsche Bank or any other bank. So what is the exact claim against Deutsche Bank? Ms. Galope has brought two claims against Deutsche Bank AG. She includes us in the antitrust claim, the Sherman Act claim, and also in the 17-200 claim, the unfair competition law, 17-200. Okay. Yeah. If we were to decide this case, and I know we have this standing question about Deutsche Bank, but setting that to one side, if we were to decide this case in 17-200, would Ms. Galope come along for the ride? I believe so, Your Honor, with this refinement. So Barclays, when it was dismissed, when summary judgment was granted as to Barclays, the rationale, the antitrust injury rationale applies with equal force to Deutsche Bank AG on the pleadings. The very questions that were being asked and the answers that were being given show that whatever injury Ms. Galope claims to have suffered, it didn't flow from any competition-reducing aspect of conduct by Barclays or by Deutsche Bank AG. So you could affirm on that basis, and of course, it was 12B2 below, but you can affirm on any basis in the record, and I believe that you could do the same for Deutsche Bank AG. So I will turn briefly to the personal jurisdiction arguments because that is the ground on which Judge Carney dismissed the case against Deutsche Bank AG. And Judge Carney did exactly what he should have done. He applied this Court's well-established rule looking at specific jurisdiction. I'll just say briefly, Ms. Galope doesn't argue general jurisdiction in a brief on appeal and Deutsche Bank's principal place of business and place of incorporations in Germany. There's no dispute about that. So Judge Carney applied the specific jurisdiction test that's been articulated and actually specifically looked at the express aiming requirements set forth in cases like College Source and Washington Shoe. And he specifically asked whether the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff who the defendant knows to be a resident of the forum state. And Judge Carney very carefully walked through in his decision the analysis there and said the complaint, quote, contains no allegation that Deutsche Bank expressly aimed any of its wrongful acts at California or had any contact with the plaintiff, much less knowledge that she was a resident of California. And the district court got it right because, as I mentioned, of the 10 paragraphs in the complaint that mentioned Deutsche Bank AG. So what do we do with 15 U.S.C. section 22? Well, 15 U.S.C. section 22 is an interesting question. I don't think you need to reach the question about nationwide contacts because I don't think it's properly before you. Ms. Gallope's counsel raised that issue the very first time in a reply brief that she filed in support of an ex parte motion to amend the complaint. In the reply brief to this court? No, I'm sorry, Your Honor. In a reply, she filed an ex parte motion before Judge Carney to amend the So this is only then raised in the proposed Fifth Amendment complaint? Yes, that's correct. In her motion, in her reply brief, in support of this ex parte application to file the Fifth Amendment, the proposed Fifth Amendment complaint, that's where she first mentions the section 22 of the Clayton Act as a basis for jurisdiction. But I will add one thing, Your Honor, which is you could look at those same paragraphs in the complaint, the jurisdictional allegations in the Fourth Amendment complaint, the actual operative complaint, and you would see that there's no nationwide contacts here either if you were to adopt that approach because there's no allegation that Deutsche Bank engaged in this conduct, again, the conduct being the alleged live war suppression. There's no allegation that that was engaged in in the United States. There's no allegation that it was engaged in outside the United States and was aimed at the United States in some way. There's neither of those things. There's no allegation that it was aimed at Ms. DeLope or to home loan borrowers who were getting these loans. There's nothing like that. So even if you take that express aiming analysis of Washington Shoe and you apply it on a nationwide basis, there's still no basis to assert jurisdiction here over Deutsche Bank AG. So lastly, I think I'll just say that there is some argument in the papers about whether Judge Kearney was right to have denied that ex parte motion for leave to amend the complaint. And I wanted to note a couple of things. First of all, that issue actually isn't mentioned in the notice of appeal in the case. So Ms. DeLope didn't appeal from that order. Number two, when Judge Kearney denied the ex parte application, he did so expressly without prejudice to that application being renewed after he ruled on Barclay's summary judgment motion. And it's very clear. If you look at it, it's in the excerpts of record. It says in bold letters, all caps, denied without prejudice. And he set forth a path for Ms. DeLope to follow in order to amend her complaint, and she chose not to do that. She chose instead to stand on her complaint and take this appeal. And that's why we're here where we are now. And then lastly, I'll just say that Judge Kearney was at what he did made sense because he had a Barclay's motion for summary judgment pending based on the fourth amended complaint he had from Ms. DeLope. He had a motion to amend the complaint. And I think he very, as a matter of case management, said, hold on. I'm going to decide the Barclay's motion. I'm not going to hear your ex parte motion to amend. When I'm done with that, you can bring a motion for reconsideration, maybe a motion to amend. She didn't do any of those things. She came up on her fourth amended complaint, which is why we're here now. All right. Any questions? Thank you. Thank you very much. May it please the Court. I'm Emily Edling. I'm representing Deutsche Bank as trustee, Auckland Loan Servicing, and Western Progressive. These are parties that are either involved in the servicing of the loan, Deutsche Bank as trustee as the current holder, Western Progressive was involved in the nonjudicial foreclosure. The claims that were alleged against my client, there were three of them in the proceedings below, are much simpler than the other claims that have been before you in this argument. There were three claims. Two of them were based on state law, one UCL, and one the duty of good faith, breach of the duty of good faith and fair dealing. And then there was a claim under 362K for violation of the bankruptcy state. All of the claims were brought, you know, was the defendant's conduct in foreclosing on the property after there had been a dismissal of the bankruptcy, but then it was reinstated I think one or two days before the foreclosure trustee's sale. So there's a question of fact whether there was a willful violation there. That's a question of fact that's not before your honors because a motion to dismiss was brought, and the Court agreed that these state law claims are preempted and that the 362K claim needs to be before the bankruptcy court, if at all. The UCL claim was abandoned on appeal. It wasn't discussed in the opening brief or on reply, so I will skip that. But Ms. Gallopi does mention the breach of good faith and fair dealing in her appellate brief. MSR exploration is really dispositive on that issue, and the district court cited it. That case specifically talks about when a claim is preempted under bankruptcy. It talks about the fact that bankruptcy courts have recognized that there is a strong importance in uniformity of bankruptcy law, and allowing state law claims that are based on conduct that occurred in the bankruptcy proceeding not only dispels that uniformity, but it actually allows state courts to disrupt what is happening in the bankruptcy and disrupt the bankruptcy itself. I want to just mention briefly also, since I see my clock is running short. Your clock is over. Oh, I'm sorry. Any questions? Thank you. Thank you. I'm going to try to really breeze through this, Your Honors. With regard to Barclays and New Century, the agency relationship, they just threw in on their reply brief a declaration by someone saying, we didn't have an agency relationship. We filed evidentiary objections to that type of improper evidence before the court as a declaration, because that is a question of law, not something for an employee or a former employee of Barclays to determine. We did also submit, and it's in Volume 3, page 413, in the Mortgage-Backed Securitized Trust. It shows the representations and warranties with regard to every single mortgage that was issued and then placed in that Mortgage-Backed Securitized Trust came from Barclays. So the fact that's why they're loan sellers, because they just basically were salespeople sitting in their own desk with their own unit, getting given the money to make the loans from Barclays, from the trust, and they also were given the loan products, these actual notes. And there was never any evidence or explanation by declaration by the moving parties who had the burden of proof that it was otherwise. With regard to suffered no injury, we have a debt here that's incurring LIBOR. So you can't say LIBOR was never an issue in this case with this purchaser. That debt will show up on her credit report. It will show up in the bankruptcy proceedings to how much that debt has accumulated. When you have a financial transaction, it isn't just the purchase and the product. It's also the debt that you're incurring. With regard to the quote on page 37, I actually said half were LIBOR rate loans, like plaintiff's loan in this case is actually approximately 70% were the fixed rate LIBOR, and then 26% were the adjustable rate LIBOR. So I didn't say that these loans weren't LIBOR loans in the trust, but some were fixed rate at the beginning and others were adjustable. I think that independent market rate when you're with the LIBOR rate, that's presumed. No one's going to take any type of credit thinking that the person that they're getting the credit from is going to actually manipulate that rate. Why would you? That's just not a reasonable consumer expectation by anyone, and we have to live in a world where we need to utilize credit in order to survive, and for these kinds of transactions, especially a long-term one like buying a home. With regard to Deutsche Bank AG, yes, my time kind of ran out on that. We do have jurisdiction here, although I did not waive it just because I put it in the reply brief below. As far as reconsideration goes, the reconsideration did not say that I could file a new motion to amend. The reconsideration was not enlarged. It was just if there would be new facts or new law, and I was not given. I asked to get discovery. I was not given the ability to give discovery. I was facing a motion for summary judgment motion where I was not allowed to even have discovery opened in this case, and I think that that offends the notion of due process in the federal court. They're saying that they can file conclusory declarations, and then as a plaintiff that's not even allowed discovery from sophisticated financial institutions, that somehow we're going to be able to rebut what they're saying with stuff that they have in their own personal knowledge. But I don't think that they even met their actual burden on their motion for summary judgment. 15 U.S.C. Section 22 I think creates a big obstacle for them. Again, everything, the timing of it was very fast and furious in the court below after the first round of appeals. There is evidence here. We filed very large excerpts of record, and I apologize to the court for how overwhelming that probably is to go through with all the technicalities. But with Deutsche Bank and AQUIN and Western Progressive, they have not cited any law that actually contradicts what we brought before this court, that there was concurrent jurisdiction, especially after the Ninth Circuit had already said that we could move forward in the case. I'm not sure why we keep on coming back to square one in this case with regard to the same issues being hashed, and it only creates further problems down the road. Counsel, you're well over your clock now, so unless you want to sum up. Yes, may I sum up? Thank you. There's no evidence to suggest that the defending financial institutions in this case, who are all part of the LIBOR panel, including Deutsche Bank and Deutsche Bank National Trust as a subsidiary, Barclays, Barclays Real Estate as a subsidiary, will not continue to maintain their relationships with each other as financial institutions. As a matter of fact, our financial institutions have become more concentrated over the past almost 10 years, and there is no indication that in this market that the LIBOR rate is going to go away. It still is there in the newspapers and still being used as an index, just like the current rate index. All right. Well, thank you, Counsel. Galope v. Deutsche Bank et al. is submitted, and this session of the court is adjourned for today. Thank you. Thank you.
judges: Wardlaw, Bybee, Bell